CHANDLER, Justice,
for the Court:
¶ 1. The State of Mississippi brought a civil-action against generic pharmaceutical provider Sandoz, Inc., (Sandoz) alleging that Sandoz impermissibly exploited Mississippi’s Medicaid reimbursement program by routinely and exponentially reporting fictitious / “Average Wholesale Prices,” a key data factor in the federally supervised formula used by the Mississippi Division of Medicaid to reimburse pharmacies serviced by Sandoz. The trial court, sitting as fact-finder, found Sandoz in violation of the Mississippi Consumer Protection Act and liable for common-law fraud. Sandoz appeals, and the State cross-appeals. -On our deferential standard of review, we affirm the trial court in full,
FACTS AND PROCEEDINGS BELOW
¶ 2. Medicaid is a joint state-federal program servicing hundreds of thousands of Mississippians.. Following the passage of the Omnibus Budget Reconciliation Act of 1990 (OBRA '90), which governs Medicaid, the number of prescription drugs eligible for reimbursement rose from approximate *834 ly 1,800 to: more than 65,000. More than 900 pharmacies eventually participated, submitting more than one million reimbursement, claims per month. The cost to each pharmacy for each drug from providers like Sandoz changed on virtually a daily basis and varied depending on the location and nature of the pharmacy.
¶3. For the relevant damages period, Mississippi Medicaid was required by regulation to reimburse pharmacies the lesser of (1) the Estimated Acquisition Cost (EAC) of the drug plus a reasonable dispensing fee, or (2) the “usual and customary” price the pharmacy charges to consumers paying for the drug without government assistance (U & C). 42 C.F.R. § 447.512(b).[1] Federal Regulations defined EAC as Medicaid’s “best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drugs most frequently purchased by providers.”
¶ 4. The federal .agency responsible for Medicaid is the Center for Medicare and Medicaid Services (CMS), formerly known as the Health , Care Financing Administration (HCFA). CM!S was required to approve of Mississippi’s “State Plan,”' including its reimbursement formula for prescription drugs. Any changes to Mississippi’s reimbursement rate had to be approved by CMS. From May 1, 1990, to March'31, 2002, Mississippi Medicaid defined EAC as the Average Wholesalé Price minus ten percent. From April 1, 2002, to June 30, 2005, EAC was defined as AWP minus twelve percent. From July 1, 2005, until October 2005, EAC was defined as (1) the lesser of AWP minus twelve percent or Wholesale Acquisition Cost (WAC) plus nine-percent for brand named drugs and single-source generic drugs, and (2) AWP minus twenty-five percent for multiple-source generic drugs.
. ¶ 5. To-satisfy its regulatory obligations and to efficiently process, the large number of reimbursement claims,.Mississippi, similar to more than forty, other programs nationwide, obtained the drugs’ AWPs from national data service First Data Bank. First Data Bank defined AWP as “the average price paid by the pharmacy to the' wholesaler for. a particular drug.” Sandoz . generated and submitted the AWPs for its drugs to , First Data Bank. Sandoz does not dispute that the AWPs it reported to First Data Bank never represented the net average wholesale prices that Sandoz received for the sale of a particular drug to a pharmacy or wholesaler, or that Mississippi Medicaid relied on Sandoz’s AWPs as published by First Data Bank to determine the EAC for purposes of reimbursing pharmacies for the ingredient cost of Sandoz’s drugs. The discrepancy betwééh the actual cost of the drug and the reported Average Wholesale Price averaged 886%.' ‘ ' '
¶ 6. Mississippi filed suit in 2005, alleging that Sandoz’s conduct of reporting inflated AWPs. caused Mississippi to reimburse pharmacies excessive amounts, and that Sandoz deliberately created and marketed the discrepancy (or “spread”) between the actual prices of their drugs and the reported AWPs in order to increase market share and profit.[2] The State asserted that Sandoz violated the Mississippi *835 Consumer Protection Act, the Mississippi Medicaid Fraud Control Act, and that its conduct constituted eommonlaw fraud. Sandoz argued that the reported AWPs were understood by all parties to be an essentially fictitious sticker price that had no relation to the actual cost of the drugs.
¶ 7. In April 2011, the trial court heard more than ten days of testimony, including more than twenty witnesses. This evidence included the testimony of both parties’ experts, the testimony of Jack Lee, Mississippi Medicaid’s Director of Pharmacy; the testimony of Helen Wetherbee, former Director of Mississippi Medicaid; the deposition testimony of Larry Reed, Technical Director for CMS’s Division of Pharmacy; reports from the Office of Inspector General (OIG); and First DataBank’s 'definitions of'AWP from 1991 to 2003. Additional relevant facts áre' discussed below.
¶ 8. The court entered its amended findings of fact and conclusions of law on October 4, 2011, finding that Sandoz committed common-law fraud and violated the Mississippi Consumer Protection Act. For the damages period of January 1, 1991, through October 20,2005, the court awarded $23,661,618 to cover the amount Mississippi Medicaid overpaid in reimbursements to pharmacies, $2,699,000 in civil penalties under the Consumer Protection Act, and $3,750,000 in punitive damages for San-doz’s willful and fraudulent misconduct. The court dismissed the claims against Sandoz under the Mississippi Medicaid Fraud Control Act and denied the State’s post-trial motion for attorney’s fees, prejudgment interest; and other relief. ■ San-doz appealed, and'the State cross-appealed.
DISCUSSION
¶ 9. We will hot reverse the trial court’s findings of fact unless manifestly wrong or clearly erroneous. Puckett v. Stuckey, 633 So.2d 978, 982 (Miss.1993). “When a trial judge sits without a jury, this Court .will not disturb his factual determinations where there is substantial evidence in the record to, support those finding?.” Transocean Enter, v. Ingalls Shipbuilding, Inc., 33 So.3d 459, 462 (Miss.2010) (citation omitted). “Fraud is essentially a question of fact best left for the [fact-finder],.. .’’ Allen v. Mac Tools, Inc., 671 So.2d 636, 643, (Miss.1996). The nine elements of common-law fraud are;
(1) a representation, (2) its falsity) (3). its materiality, (4) the speaker’s, knowledge of its falsity or ignorance of. its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer’s ignorance of its falsity, (7) his reliance- on its truth, (8) his right to rely thereon, and (9) his consequent and proximate, injury.
Franklin v. Lovitt Equip. Co., Inc., 420 So.2d 1370, 1373 (Miss:1982). Each element of fraud must be proven by clear and convincing evidence. Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983).[3]
¶ 10. For both the State’s common-law fraud and Consumer Protection Act claims, the primary issue of fact determined below was the parties’ understand *836 ing of the meaning of the term “Average Wholesale Price” as this phrase was used for purposes of pharmaceutical reimbursement by the Mississippi Division of Medicaid. The trial court found clear and convincing evidence supporting that the State understood the Average Wholesale Price data generated by Sandoz to be related to the pharmacies’ actual drug acquisition cost, that the State reasonably relied on this data to calculate its best estimate of .the actual cost of the drugs to the pharmacies, that Sandoz intentionally reported fictitious prices that had zero relationship to the actual cost of the drug while knowing that Medicaid programs used these prices to estimate how much they shodld reimburse pharmacies, that Sandoz advertised to pharmacies the discrepancies between the actual and fictitious prices to attract business, and that Medicaid reasonably relied on the false data, reimbursing pharmacies $23,661,618 in excess of the regulatory minimum. We find that the State presented evidence sufficient to have enabled the trial court to have found the elements of fraud by clear and convincing evidence.
¶ 11. The court was confronted with evidence demonstrating the significant changes Mississippi Medicaid’s pharmacy division faced following the enactment of OBRA. 90, including a shift in the most frequently applied reimbursement formula to calculate the lowest reimbursement rate reasonably possible for the new open for-mulary. Rather than most frequently reimbursing the “usual and customary” price the pharmacy charges to consumers paying for the drug without government assistance, Medicaid now reimbursed most often by its best estimate of the acquisition cost plus a reasonable dispensing fee. The reported Average Wholesale Price was a data factor in 100 percent of reimbursements made under this method. Sandoz generated and reported its AWPs to First DataBank, ‘to which Medicaid, along with forty-five other similar -programs, subscribed.[4]
¶ 12.. Helen Wetherbee, the Executive Director of the Division of Medicaid from 1991 to 1999, described in detail the limited resources available to the pharmacy division of Mississippi Medicaid at the time it was tasked with implementing the new reimbursement policies under OBRA 90 and after. This description included the necessity of relying on First DataBank for reported AWPs and the impossibility of surveying pharmacists to get invoice prices for each drug before reimbursement. The pharmacy division was staffed with two people in program integrity and three people in program services. She testified that there was “no practical alternative” to obtaining prices other than subscribing to First DataBank:
We didn’t have the computer resources to do that. We certainly didn’t have the staff to do anything manually. First DataBank was the national standard, the gold standard, if you will, and so I felt very comfortable relying on First DataBank as being the best possible way I knew to serve the Medicaid program and. get prompt, accurate information with respect to pharmacy product pricing.
The trial court agreed, stating that Medicaid’s decision to rely on Sandoz’s published AWPs was “the best and most efficient *837 way for [Mississippi Medicaid] to obtain, accurate pricing information for Sandoz drugs.”[5]
¶ 13. Mississippi Medicaid was not alone in relying on the numbers reported to First DataBank, and the evidence supported the finding that this reliance was reasonable. Forty-five similar programs nationwide used First DataBank to obtain AWPs. The industry did not expect Medicaid programs independently and continually to investigate the ever-changing actual price of 65,000 or more prescription drugs purchased by 900 or more pharmacies state-wide. As the trial court concluded, “because of the constantly changing prices for drugs on virtually a daily basis, obtaining this accurate information was virtually impossible considering DOM’s lack of resources.” Other jurisdictions agree. As Wisconsin successfully argued:
As with other states throughout the country, the solution that emerged was for pharmaceutical manufacturers like Pharmacia to report certain figures to calculate reimbursements. The most important of those figures was AWP. Pharmacia provided AWPs for its drugs to First DataBank, an independent company that organized, and disseminated information regarding the pharmaceutical industry to Medicaid, which then plugged them into its reimbursement formula.
Pharmacia, as with all manufacturers, reported AWPs in agreement with Medicaid that the AWPs were supposed to reflect what the name suggested: the average price for which the drug was sold by the wholesaler to the pharmacy.
State v. Abbott Laboratories, 816, N.W.2d 145, 152-53 (Wis.2012). See also In re Pharm. Industry Average Wholesale Price Litigation v. AstraZeneca Pharmaceuticals LP., 582 F.3d 156 (1st Cir.2009).
¶ 14. First DataBank defined AWP as “the average price paid by the pharmacy to the wholesaler for a particular drug.” Wetherbee’testified that Medicaid’s understanding of AWP was consistent with the idea that AWP was developed because there had to be some price which' all parties could agree upon if machine processing of claims was to be possible, with AWP representing an average price which a wholesaler would charge a pharmacy for a particular product. First DatáBank also stated that “AWP never means that every purchase of that product will be exactly that price. There are many factors involved in pricing at the wholesale level which' can modify the prices charged even among a group of customers from the same wholesaler.” The State never denied that these “many factors” informed its understanding of AWP, including that, to arrive at a trué estimated acquisition cost, reimbursement based bn AWPs should be discounted. However, Wetherbee testified, “all of us who were involved’in pharmacy reimbursement believed we were getting accurate information and we were paying a real estimated acquisition cost.”
¶ 15. Undisputed is that pharmaceutical providers came to exaggerate exponentially their reported AWPs to the extent that the reported price, even as discounted, had zero relation to the pharmacies’ actual acquisition costs.[6] This “spread” *838 was then used as a marketing tool to gain pharmacy business -in a competitive generic market.[7] The trial court concluded that the AWPs “were not prices at all-otherwise, if they had been, the State’s reimbursement system would have worked as intended.” Christopher Worrell, Sandoz’s Vice President of Sales and Marketing from 2002 to 2005 and the individual responsible for assigning AWPs, denied that Sandoz had engaged in the practice of “marketing the spread” between AWPjs and actual prices to gain pharmacy business. However, the court was presented with evidence supporting that Sandoz did “market the spread,” including a 1992 letter to a customer stating “[w]e offer substantial margins between acquisition costs and [Average Wholesale Price] for your profit potential.” In 1998, Sandoz bragged to a client that its reported AWP for Ranitidine was $86, but the acquisition price for the pharmacy would be only $7.16, a spread of 1,201 percent. Additionally, the court saw examples of confidential[8] offers , to customers such, as Wal-Mart, listing under a description of the drug prices both the amount of the contract price and the different AWP amount. Evidence of this practice also was presented to the court- in the form of the OIG investigative reports of the growing problem at a national level. Worrell also testified that he was aware, “there was some other reimbursement formula that might use AWP” but that from his perspective “[i]t was a very small piece of, the business.” Presented with- conflicting evidence, it was the place of the trial court, sitting, as finder of fact, to weigh the .credibility of the witnesses and evidence. The evidence supported the conclusion by the finder of fact that Sandoz . advertised two key data points to its potential. pharmaceutical customers; the actual cost of the drug and the fictional cost of the drug, and- that Sandoz .then reported the fictional cost of the drug .-to First -DataBank, knowing that Medicaid programs relied on that data to calculate the actual cost of the drug.
¶ 16. The evidence also is undisputed that Medicaid programs became increasingly aware that the reported AWPs were exaggerated and that they reacted to that awareness by increasing the discount of AWP. But a qualitative: distinction exists between knowledge that an- actual price is exaggerated and knowledge that a “price” is fictitious and assigned solely for the *839 purpose of creating a fraudulent profit margin. The State persuasively demonstrates the distinction between knowing that a representation is likely to.be only approximately true, versus knowing that it is a complete fabrication, by pointing to cases involving the sale of land. A defendant may know, that a representation of a building’s square footage is only approximate, or that a parcel of land is “about” a certain number of acres, but have a viable fraud cláim where the represented numbers were “materially and unreasonably inaccurate” or ‘^grossly erroneous.” See Kenneally v. Bank of Nova Scotia, 711 F.Supp.2d 1174, 1185-1186 (S.D.Cal.2010).[9] This is an apt comparison to Mississippi Medicaid’s understanding of the price AWP represented. Mississippi knew that AWP “never means that every purchase of that product will be exactly at that price” and that ‘‘many factors” are involved .in pricing that can “modify” the actual price from the reported-, AWP. What the State was unaware of was the astronomical discrepancy between the actual cost and the reported AWP, a discrepancy that averaged 886% and caused Mississippi taxpayers • to overreimburse pharmacies $23,661,618.
¶ 17. To accept Sandoz’s argument that the State knew the reported AWPs had zero relationship to actual cost would be to say that Medicaid essentially colluded with the generic drug industry for more than a decade in exploiting the inefficiericies' inherent to a government bureaucracy in violation of Medicaid’s own statutory ■ and regulatory obligations. Wetherbee testified “[m]y basis [for understanding the meaning of AWP] was the universal awareness that we were a government program Using public funds with'a determination to be good stewards of the money, and I hope a reputation for integrity, basing bur reimbursement on.what we thought was accurate information.”[10]
¶ 18. The court was presented with evidence supporting that the timing and degree of adjustments to Mississippi’s reimbursement formula was, reasonable given the State’s lack of knowledge of the degree of AWP inflation as it uniquely affected Medicaid reimbursement in Mississippi. The 1997 and 2002 OIG reports, while an *840 important impetus to motivating investigation and (what is, by necessity a slow regulatory process) eventual change, were not immediately conclusory to Mississippi’s individual concerns. Wetherbee explained:
Mississippi is at the extreme, both in .terms of its poverty level and the rural nature of its population demography so that what would apply in New York or California may or may not apply in Mississippi ... in Mississippi we have higher level of people living below the poverty level and a greater number of people living in rural areas, because of which we would also have a higher proportion of community pharmacies in rural areas. So there were a lot of reasons why a generalized nationwide determination ... would certainly be of interest but ... I did not conclude that [the OIG report] was directly applicable to Mississippi .... It would be most likely that a chain pharmacy would be the beneficiary of some sort of purchasing contract or quantity -discount that an independent pharmacy might enjoy.[11]
A subsequent “look-and-see” investigation by Medicaid Pharmacy Director Jack Lee into the pricing of a small handful of pharmacies led to a recommendation that “AWP minus 10 percent might no longer be applicable in Mississippi.” The discount subsequently was raised — following CMS approval — to 12 percent and then again to 25 percent.[12] Mississippi could not act without accountability in setting a plan that,would satisfy its regulatory obligation to reimburse .at the lowest rate reasonably possible. Larry Reed, Technical Director of CMS’s Division of Pharmacy, explained that CMS would not approve a state reimbursement plan that did not provide an acceptable method to arrive at the estimated cost for the drugs. Sandoz’s own expert Robert Helms testified' that CMS would not approve a change in the reimbursement formula that matched the highest OIG estimate of AWP inflation in other parts of the country. Wetherbee stated that, in a testament to the quality of work Mississippi invested in its proposed state plans, that Mississippi Medicaid “never had a federal disallowance with respect to our pharmacy reimbursement.”
¶ 19. The trial court was presented with evidence to support that Medicaid’s reimbursement policies consistently were based on- an understanding that adjusting the .reported AWPs would arrive at its best estimate of the actual cost, factoring in unpredictable variations in regional markets. See In re Pharm. Industry Average Wholesale Price Litigation, 582 F.3d 156, 188 (1st Cir.2009) (affirming finding that “costs of acquiring and acting upon the information necessary to understand the full extent of the AWP inflation were prohibitive.”).
¶20. In light of the conflicting testimony regarding the parties’ understanding of the term AWP, the trial court appropriately rejected Sandoz’s argument that all parties understood AWP to be a fictitious “term of art.” Courts refrain from establishing a technical term of art when there is conflicting testimony regarding the definition of the term. Commonwealth of Mass. v. Blackstone Valley Elec- *841 trie Co., 67 F.3d 981, 986 (1st Cir.1995). A departure from the plain meaning of a term is only warranted when the term has a “well-defined” understanding within the relevant field in which it is used. Coming Glass Works v. Brennan, 417 U.S. 188, 201-202, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). Not only this litigation, but current litigation nationwide supports that AWP was not “well-defined” as a fictitious term of art having no value to reimbursement calculations. The trial- court exhaustively considered the evidence before it, and we cannot find that the trial court manifestly erred in determining that San-doz’s conduct rose to the level of common-law fraud.

Mississippi’s Consumer Protection Act.

¶21. The trial court found that “Sandoz’s submission of [Average Wholesale Prices] to [First Data Bank] that have no predictable relationship to what customers pay for its drugs while knowing Mississippi relied on this information in determining [Estimated Actual Cost] is an unfair and deceptive trade or practice within the meaning of Mississippi’s Consumer Protection Act.” Mississippi’s Consumer Protection Act (CPA) prohibits “unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce.” The CPA additionally prohibits “misrepresentations of fact concerning the reason for, existence of, or amounts of price reductions.” See Miss.Code Ann. § 75-24-6 (Rev.2009). The purpose of the CPA is “to protect the citizens of Mississippi from deceptive and unfair trade practices.” Holman v. Howard Wilson Chrysler Jeep, Inc., 972 So.2d 564, 572 (Miss.2008).'
¶ 22.. Mississippi does not require a finding of fraud for an act to be deemed unfair or deceptive, making our affirmance of the trial court’s judgment on this issue even easier than affirming its finding of fraud above. Holman v. Howard Wilson Chrysler Jeep, Inc., 972 So.2d 564, 572 (Miss.2008); see also AstraZeneca, 582 F.3d at 184 (holding act or practice can be unfair or deceptive even if no violation of common law); Wash. State Physicians Ins. Exch: & Ass’n v. Fisons Corp., 122 Wash.2d 299, 858 P.2d 1054, 1063 (1993) (affirming jury verdict for violation of similar statute when jury also returned verdict denying fraud claim)..
■ ¶ 23. Rather, when “construing ■ what constitutes unfair or deceptive trade practices ... the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USCS 45(a)(1)) as from time to time amended.” Miss.Code Ann. § 75-24-3. A trade practice is. unfair if it (1) causes or is likely to cause a substantial injury; (2) .the injury is not “outweighed by any countervailing benefits to consumers or competition that practice produces;” and (3) the injury could- not have been “reasonably avoided.” 15 U.S.C. § 45(n)(1980). In reviewing, whether a trade practice is unfair, the FTC “may consider, established public policies as evi-dpnee to be considered with all other evidence.”
¶ 24. Evaluating these -'factors, we find that the trial.court did not manifestly err in determining that Sandoz’s conduct was unfair and deceptive within the meaning of Mississippi’s Consumer Protection Act. Sandoz’s unfair reporting of fictitious AWPs caused the substantial injury of $23,661,618 in overpayments to pharmacies participating in Medicaid. No “countervailing benefits to consumers or competition”--resulted from Sandoz’s conduct. And we already have discussed above that Medicaid’s reliance on the reported AWPs, which mirrored the practice *842 of similar programs nationwide, was rear sonable. The trial court did not err in finding that Medicaid should not have had pharmacies submit cost information, for every Medicaid reimbursement submission. See AstraZeneca, 582 F.3d at 188 (affirming finding that “costs of acquiring and acting upon the information necessary to understand the full extend of the AWP inflation were-prohibitive.”); Abbott Labs., 341 Wis.2d at 524-25, 816 N.W.2d 145 (“Because of the complexity and, dynamism of the pharmaceutical industry, Medicaid required a consistent and broadly applicable formula for determining the appropriate reimbursements fpr pharmacies — ”)•
¶ 25. The trial court did hot err in rejecting Sandoz’s argument that'the State is hot a consumer for purposes of the Act. Mississippi is not the first jurisdiction to conclude' that the inflation of Average Wholesale Prices violates standard Consumer Protection Act provisions and that • thé State is appropriately viewed as a consumer for purposes of the act. As the trial court stated “[significantly, Courts involved in virtually identical AWP litigation in other jurisdictions have applied similar State Consumer Protection Acts and rejected identical arguniénts as Sandoz asserts here. ‘It is apparent that the State is the ultimate purchaser in the chain of distribution and the one directly affected by the alleged manipulation of the AWP.’.” See-Idaho v. Alpharma, USPD, Inc., No. CV-0C-0701847, 2007 WL 5273981 (Id. Dist.Ct. Aug. 31, 2007); Kentucky v. Alpharma, USPD, Inc., No. 04-CI-1487; Common Wealth of Pennsylvania v. Bristol-Myers Squibb Co., No. 212 M.D. 2004 (Pa.Commw.Ct. Sept. 10, 2010); Commonwealth v. Johnson & Johnson, No. 212 M.D. 2004, 2010 WL 5166716 (Pa. Commw.Ct. Dec. 7, 2010); see also In re Pharmaceutical Industry Average Wholesale Price Litigation v. AstraZeneca, 582 F.3d. 156 (1st Cir.2009) (affirming trial court’s finding drug company liable for unfair and, deceptive business practices for publishing inaccurate “average wholesale price”).
¶ 26. The trial court did not err in findirig that Sandoz’s practice of reporting false AWPs was a deceptive trade practice. The “prices” were exaggerated to an extent that they were not even prices. Providing false information is deceptive and violates the Act. See Holman,. 972 So.2d at 571-72; S.W. Starving Artists Group, Inc. v. State, 364 So.2d 1128, 1131 (Miss.1978). People v. Pharmacia Corp., 27 Misc.3d 368, 895 N.Y.S.2d 682, 693-94 (N.Y.Sup.Ct.2010) (holding that where pharmaceutical company knew of reliance on its published prices, it “had an obligation to refrain from reporting prices in a fraudulent or deceptive manner or causing fraudulent or deceptive prices to be published.”).

The State’s Cross-Appeal

I. The trial court did not abuse its discretion by denying the State’s request for attorneys’ fees.
~¶ 27. ! The State first requested attorneys’ fees in its motion to alter the final judgment. The trial court denied the State’s motion. The State argues that the trial court erred by declining to award attorneys’ -fees because attorneys’ fees should be awarded whenever1- punitive damages are awarded, and because the State was entitled to recover attorneys’ fees under the CPA. See Miss.Code Ann. § 75-24-19(l)(b) (Rev.2009).
¶28. “Absent some statutory authority or contractual provision, attorneys’ fees cannot be awarded unless punitive damages are also proper.” Miss. Power & Light Co. v. Cook, 832 So.2d 474, 486 (Miss.2002). When punitive damages are awarded, a post-judgment request for *843 attorneys’ fees is proper. Fulton v. Miss. Farm, Bureau Cas. Ins. Co., 105 So.3d 284, 285 (Miss.2012). But even when punitive damages are appropriate, “the allowance and the amount of ,a fee is a matter committed to the sound discretion of the trial •judge.” Smith v. Dorsey,. 599. So.2d 529, 550 (Miss.1992). “Attorney fees may be awarded in cases where punitive damages are proper....” Valley Forge Ins. Co./ CNA Ins. Co. v. Strickland, 620 So.2d 535, 542 (Miss.1993) (emphasis added). And an award of attorneys’ fees to the Attorney General is discretionary under the CPA. Miss.Code Ann. § 75-24-19(1)(b) (Rev. 2009) ([t]he Attorney General may' also recover ... a reasonable attorney’s fee) (emphasis added).
¶ 29. Whether or not to award attorneys’ fees is within the sound discretion of the trial court. Smith, 599 So.2d at 550. Contrary to the State’s arguments, a punitive damages award does not mandate an award of attorneys’ fees;, whether to award attorneys’ fees always remains within the trial court’s discretion. Smith, 599 So.2d at 550. Nor does the CPA make an award of attorneys’ fees mandatory upon the State’s recovery of penalties. Miss. Code Ann. § 75-24-19(1)(b) (Rev.2009). Rather, because the CPA states that the Attorney General may recover attorneys’ fees, the decision to award attorneys’ fees under the CPA is within the. discretion of the trial court. Miss.Code Ann. § 75-24-19(1)(b) (Rev.2009). We cannot say that the trial court abused its discretion in denying the State’s request for attorneys’ fees.
II. The trial court did not abuse its discretion by declining to award prejudgment interest.
¶'30. Ari award of prejudgment interest is within the trial court’s discretion. In re Estate of Smith, 69 So.3d 1, 4 (Miss.2011). The trial court declined to award prejudgment interest on the State’s successful common-law fraud claim.[13] Citing Upchurch Plumbing, Inc. v. Greenwood Utilities Commission, 964 So.2d 1100, 1117 (Miss.2007), the' trial court found that prejudgment interest would not be allowed because the fraud claim was unliquidated. Upchurch held that “prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or where the denial of a claim is frivolous or in bad faith.” Id. (quoting Stockstill v. Gammill, 943 So.2d 35, 50 (Miss.2006)).
¶31. The trial court’s denial of prejudgment 'interest was within its discretion. “Prejudgment interest ‘is not imposed as a penalty for wrong doing; it is allowed as compensation for the detention of money overdue.’ ” Terex Corp. v. Ingalls Shipbuilding, Inc., 671 So.2d 1316, 1323, 1324 (Miss.1996) (Sunburst Bank v. Keith, 648 So.2d 1147, 1153 (Miss.1995)). Here, the damages were unliquidated, and the trial court did not find bad, faith. While the State argues that Sandoz’s fraudulent conduct was evidence of bad faith, “the primary focus of the, law in ¡this area concerns bad faith insurance claims,” and this case does not involve a bad-faith, denial of an insurance claim or of money due under a contract. Terex Corp,, 671 So.2d at 1323. We affirm the trial court’s denial of the State’s prejudgment interest claim.
III. The trial court appropriately applied the statutory punitive-damages cap to the State.
¶ 32. The State argues that, due to its sovereignty, this action is excluded *844 from the punitive-damages cap in Mississippi Code Section ll-l-65(3)(a). Section ll-l-65(3)(a) states, in relevant part, that:
(a) In any civil action where an entitlement to punitive damages shall have been established under applicable laws, no award of punitive damages shall exceed the following:
[[Image here]]
(iv) Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000.00) for a defendant with a net worth Of more than One Hundred Million Dollars ($100,000,000.00) but not more than Five Hundred Million Dollars ($500,000,000.00)....
Miss.Code Ann. § ll-l-65(3)(a) (Rev. 2014).
¶ 33. The State argues that its ability to recover damages cannot be limited by a statute unless the statute places an express limitation on the State. The State relies on Jackson v. Mississippi Building Commission, 350 So.2d 63, 64 (Miss.1977). In Jackson, the State Building Commission filed a complaint arguing that the City unlawfully had required the Commission to obtain a building permit and pay fees under municipal building codes. Id. at 63-64. A 'statute authorized the Commission to construct state' buildings. Id. at 65-66. This Court held that the- statutes granted the Commission plenary power to construct buildings, and the municipal building codes, which did not expressly subject the State to the codes, did not apply to the State. Id. at 66. Jackson cited common-law principles to the effect that statutes cannot divest the State’s rights in general terms, but must express an intent to limit the State. Id. at 64-65. Jackson stated:
By resorting merely to well-known principles of statutory construction, it is evident that the State may not be restricted in-its sovereignty except by the specific provisions of its statutes.
[[Image here]]
[T]he Court said: “It is the settled doctrine that the general words of ¾ statute do not include the State; or affect her rights, unless she be specially nanied, or it be clear and indisputable from the act that it was intended to include the State.” ... “It is.undoubtedly the general rule that, where the effect of a statute is to restrict the rights of, or impose liabilities upon, the state or its political subdivisions, it will be held to be inapplicable to them, unless they are included expressly or by necessary implication.”
Id. • (quotations omitted). Jackson also rested its holding upon the principle that á ■statute granting plenary power to a state agency supersedes any conflicting local or general regulations. Id. at 66.
¶34. A plain reading of Section ll-l-65(3)(a) indicates that it applies to actions by the State, either “expressly or by necessary implication.” Jackson, 350 So.2d at 65. Section 11-1-65 states that it applies to “any civil action” where an entitlement to punitive damages is established. Miss.Code Ann. §11-1-65(3)(a). “[T]he word ‘any5 has an expansive meaning, that is, ‘one or some indis-crifninately of whatever kind.’” United States v. Gonzales, 520 U.S. 1, 5, 117 S.Ct. 1032, 1035, 137 L.Ed.2d 132 (1997). “If the words of a statute are clear and unambiguous, the Court applies the plain meaning of the statute and refrains from using principles of statutory construction.” Lawson v. Honeywell Int’l, Inc., 75 So.3d 1024, 1026 (Miss.2011). We hold that, because the plain language of Section 11 — 1— 65(3)(a) includes actions by the State, the trial court properly applied the statutory *845 punitive-damages cap to the State.[14] And, although the State argues that it should be exempt from the caps because it brought the action on behalf of its citizens, an action by individual citizens would be sub-; ject to the caps,- and ■ the State- cannot recover more for- the citizens than the citizens themselves could recover,
¶35. -The State devotes a short paragraph in its brief to ah argument that the Mississippi Constitution forbids the Legislature to abrogate-the State’s right to collect punitive damages. Because the State did not raise this argument before the trial court, it is procedurally barred from .appellate consideration. •. “This Court’s general policy is that ‘errors raised for the first time on appeal will not be considered, especially where constitutional questions are concerned.’ ” Powers v. Tiebauer, 939 So.2d 749, 752 (Miss.2005) (quoting Stockstill v. State, 854 So.2d 1017, 1023 (Miss.2003)),
IV. The trial court properly used Sandoz’s net worth from the end of the prior fiscal year in capping, punitive damages.
¶ 36. As an alternative to'its argument that the statutory punitive-damages caps do not apply to it, the State argues that the trial court did not correctly evaluate Sandoz’s net worth for the purposes of selecting the appropriate punitive-damages , cap. Section ll-l-65(3)(a) caps punitive damages based on a defendant’s net worth. Miss.Code Ann. § 11 — 1— 65(3)(a) (Rev.2014). The parties’ discovery efforts yielded quarterly balance sheets beginning in 2010 for each quarter leading up to the March 2012 punitive-damages hearing, and monthly income statements from 2010 up to the date of the hearing. At the hearing, Sandoz presented testimony of chief-financial- officer James Masta-kas that, according-to generally accepted accounting principles, the -net worth of Sandoz on December 31, 2011,-was a number under five hundred-million dollars.
¶ 37. Under Section 11 — 1—65(3)(a)(iv), if. a ’defendant’s1 net worth is between $100 million arid $500 million, punitive damages are capped at $3.75 million. The State attempted to show that Sandoz’s net worth in 2012 had risen to more than $500 million, which would have entitled the State to $5 million in punitive damages under the applicable cap. During cross-examination of Mastakas, the State used 2012 balance sheets and income statements in an attempt to show that, after January 1, 2012, Sandoz’s net worth had increased to more than $500 million. But Mastakas stated that the information used by the State was insufficient to calculate Sandoz’s net worth after January 1, 2012, according to generally accepted, accounting principles. The State presented no expert.testimony establishing that Sandoz’s net worth after January 1, 2012, exceeded $500 million under generally-accepted accounting principles.
¶ 38. The trial court assessed punitive damages based on Sandoz’s net worth as of December 31, 2011. The State argues that the trial court erred by using Sandoz’s net worth as of December 31, 2011, rather than its net worth as of the date of the judgment on punitive damages. The State argues that the chancellor’s use of December 31, 2011, as the valuation date was error because, in Franklin Corp. v. Tedford, 18 So.3d 215, 241 (Miss.2009), this *846 Court held that net worth must be determined at the time of the judgment.
¶ 39. “The proper assessment of punitive damages under Mississippi Code Section 11-1-65(3) is a question of law, to be reviewed by this Court de novo.” Id. at 241. We find no error in the trial court’s net-worth determination. ¡Section 11 — 1— 65(3)(b) states that “the amount of the net worth shall be determined in accordance with Generally Accepted Accounting Principles.” Miss.Code Ann. § 11 — 1—65(3)(b) (Rev.2014). In Franklin, the Court held that generally accepted accounting principles contemplate that’ net worth be the current net worth, or the net worth at the time of the judgment on punitive damages. Franklin, 18 So.3d at 242. Quoting the trial court’s opinion, the Court stated that:
[T]he language of Miss.Code Ann. Section 11-1-65 which relates to the imposition of the legislative caps to a punitive' damage award provides' that the net worth of the defendant “shall be d'eter-mined” in accordance with Generally Ac-cépted Accounting Principles, and that such language implies that the current net worth of the defendant is to be considered. Further, other portions of the statute refer to the net worth of the defendant as a factor to be considered in an effort to determine the defendant’s financial ability to pay the award, and' likewise implies that the current net worth of the defendant is to be utilized — Further, there is no language in the statute which provides that the past net worth of the defendant is to be utilized, and without such distinguishing language, this court must apply the common meaning "of the term “net worth, ” as well as the common interpretation as afforded by a reading of the statute as a whole.
Id. (emphasis in original). ■
¶40. We observe that the trial court in Franklin used the defendant’s net worth as of December 31, 2006, but the final judgment was not entered until May 31, 2007. Id. at 230. So, although Franklin stated that net worth should be calculated at the time of the judgment, it in fact affirmed a net-worth calculation from the time of the hearing. Id. Due to the practical limitatiofis of computing net worth before the hearing date, in addition to the fact that presentation of evidence normally ends at the close of the hearing, we find that net worth should be calculated as near to the time of the hearing as practicality allows. The evidence must be sufficient to enable the trial court to determine the defendant’s current net worth, according to generally accepted" accounting principles.- Miss.Code Ann. § Tl-l-65(3)(b) (Rev.2014).
. ¶ 41. We hold that the trial coprt’s net-worth determination did not contravene Franklin. Sandoz proved that its- most recent quarterly financial information showed that its net worth on December 31, 2011, was less than $500 million, according to generally accepted accounting principles. No evidence was before the trial court that Sandoz’s net worth had exceeded $500 million by the time of the hearing. Mastakas refuted the State’s suggestions to that effect on cross-examination, and the State presented no expert testimony by a qualified accountant that, according to generally accepted accounting principles, Sandoz’s net worth currently exceeded $500 million. The trial court used the most recent quarterly financial information to determine Sandoz’s net worth. The sole competent evidence of Sandoz’s current net worth was presented by Sandoz, and the trial court appropriately credited the evidence and testimony that, under generally accepted accounting principles, San-doz’s net worth was less than $500 million.
*847 V. The trial court correctly defined Sandoz’s-violation of the CPA as each publication of a false AWP, rather than each time Sandoz caused the State to overpay for a drug.
¶42. The State argues that the chancellor erred in calculating the number of Consumer Protection Act violations by the number of occasions that Sandoz reported an AWP, rather than the number of occasions Medicaid reimbursed a claim using a reported AWP. The Chancellor found 2,699 violations and awarded the State $1,000 per violation.[15] While Mississippi does not have a statute or case on point, United States Supreme Court cases addressing similar penalties available under the. federal False Claims Act and State cases. addressing similar AWP litigation support the Chancellor’s decision to apply the “per violation” language of Section 75-24-19(l)(b) to the number of occasions that Sandoz improperly set an AWP during the relevant damages period. In United States v. Bornstein, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the United States Supreme Court held that' únder the federal False Claims Act, which contains a similar per-violation penalty as Mississippi’s CPA, “the focus in each case [must] be upon the specific conduct of the person from whom the Government seeks to collect the [penalties].”' 423 U.S. at 313, 96 S.Ct. 523. There, the Court concluded that the number of violations were three fraudulent invoices issued by the defendant general contractor to a subcontractor, rather than the thirty-five subsequent invoices billed to the federal government from the subcontractor. The Wisconsin Supreme Court applied a- similar approach in AWP litigation, stating that “[t]he number of times pharmacies were overpaid is merely a consequence of the alleged fraud, not the fraudulent conduct itself.” Abbott Labs., 816 N.W.2d at 173-74. We affirm the chancellor’s use of the reported AWPs to calculate the number of violations under CPA. We also find that the trial court did not abuse its discretion in failing to award thé maximum $10,000 per-violation penalty for the CPA violations.
VI. The trial court did not err in dismissing the State’s^ statutory claim under the Medicaid Fraud Control Act.
¶43. The State argues that the trial court erred, in dismissing the State’s statutory claim-under the Medicaid Fraud Control Act on the ground that the Act’s civil liability provision is inapplicable to Sandoz. The MFCA’s civil liability provision states:
A health care provider or vendor committing any act or omission in violation of this article shall be directly liable to the state and shall forfeit and pay to the state a civil penalty equal to the full amount received, plus an additional civil penalty of triple the full amount received.
Miss.Code Ann: § 43-13-225(1). We affirm the trial court’s dismissal of the MFCA claims on the ground that the civil liability provision does not provide for recovery beyond the amount the defendant has improperly received. The parties do not dispute that Sandoz never received any direct payment from thé State, and under the language of this statute the parties are too far removed to permit recovery. As the trial court noted in its opinion, in 2006, 2007, and 2010, the Mississippi .Legislature considered bills that would have replaced the “full, amount received” language with language that permits recovery for the “amount of damages that the State sus *848 tains because of the act of that person.” The fact that the Mississippi Legislature considered such a change demonstrates its recognition that the existing penalty provision was limited to the amount a provider or vendor received and thus required an amendment if it was to also cover the amount of the State’s loss. We therefore affirm the trial court on this issue.
CONCLUSION
¶ 44. On our deferential standard of review, we affirm the trial court’s finding that Sandoz committed common law fraud and violated the Mississippi Consumer Protection Act. Mississippi Medicaid reasonably relied on Sandoz’s fictitious Average Wholesale Prices to reimburse pharmacies in excess of the Estimated Acquisition Cost of the drugs. We find the State’s issues on cross-appeal to be without merit. We affirm the , trial court’s judgment in . all respects.
¶ 45. ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.
KITCHENS And KING, JJ., CONCUR. RANDOLPH, P.J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LAMAR, PIERCE AND COLEMAN, JJ. LAMAR, J., DISSENTS WITH SEPARATE WRITTEN • OPINION JOINED BY DICKINSON, P.J., PIERCE AND COLEMAN, JJ. WALLER, C.J., NOT PARTICIPATING.

. For the relevant damages period, U & C was employed for only eight- percent of reimbursement claims. Reimbursement was also sometimes’based on the "Federal Upper Lim- ; it," defined at 150 percent of the lowest published number for a generic equivalent.

. The suit initially was filed against some eighty-six drug companies, most of which have settled. Sandoz was known as Geneva Pharmaceuticals, Inc., until 2003.

. The dissent, along with reweighing the credibility of the evidence in contravention of the manifest-error standard of review, adopts an outlier position in its eváluation of the elements of fraud. Even states that have found that their respective Medicaid programs had sufficient knowledge of the level of local inflation to defeat claims of fraud still found the represented ÁWPs to be false) misleading, and ' deceptive. Sandoz, Inc. v. Commonwealth ex rel. Conway, 405 S.W.3d 506, 511 (Ky.Ct.App.2012); see also AstraZeneca LP v. State, 41 So.3d 15 (Ala.2009) (Alabama Medicaid had internal pricing studies on 80% of its pharmacies, compared herd to Mississippi's sample • survey of three pharmacies).

. The dissent misleadingly focuses on Medicaid’s "decades” of prior knowledge that AWPs needed a discount to arrive at a literally accurate number. This is undisputed. The question for the relevant damages period became the level of knowledge of the degree of inflation, Moreover, for the first four years of OBRA '90’s .enactment, reimbursement discounts were frozen by federal- law.

. This discredits the dissent’s implication that Medicaid somehow copped out by setting reimbursement fates based on nationally available subscription numbers rather than by independently investigating and obtaining hundreds of thousands of individual invoices from pharmacies on a biweekly basis.

. The increasingly pervasive pharmaceutical practice of arbitrarily assigning artificially high drug prices for profit is currently at the forefront of the national conversation on healthcare costs and corporate ethics. See Andrew Pollack, Sabrina Tavemise, A Drug Company's Price Tactics Pinch Insurers and *838 Consumers, N.Y. Times (Oct. 4, 2015), http:// www.nytimes.com/2015/10/05/business/ valeants-drug-price-strategy-enriches-it-but- . infuriates-patients-and-lawmakers.html; Andrew Pollack, Once a Neglected Treatment, Now an Expensive Specialty Drug, N.Y, Times (Sept 20, 2015), http://www.nytimes.com/ 20 Í5/09/2 l/business/a-huge-overnight-increase-in-a-drugs-price-raises-protests.html

. As explained in Abbott Laboratories:
Over time, however, the manufacturers began reporting inflated AWPs. They did so to engage in a practice known as “marketing the spread.” When.a manufacturer “marketed. the spread,” it- reported an inflated AWP to Medicaid and Medicaid then paid the pharmacy more for the drug than the pharmacist paid the wholesaler for the same product..,. Pharmacia "marketed the spread” along with its competitors, and it reported more and more dramatically inflated AWPs over time.
Abbott Laboratories, 816 N,W,2d at 153.

. fhe confidential trade-secret nature of the spreads further served to prevent programs from ascertaining the exact degree of inflation relevant to local programs. Wetherbee testified that by the late 1990s, "I would say there was a great deal of information suggesting that AWP was a distorted or inflated figure[,]” but that “[w]hen I was at the Division of Medicaid, I did not know what the spread was.” This quote explicitly rebuts the dissent's pervasive assertion that the. State did not take the position below that it was aware that AWPs were inflated.

. See also Parker v. Bennett, 32 N.C.App. 46, 231 S.E.2d 10, 12-13 (1977) (reversing summary judgment for defendant who told buyers that parcel was “125 acres, more or less” but size was ninety-five acres). . .

. The dissent’s emphasis that Sandoz submitted "Average. Manufacturer Prices,” or AMPs, to First DataBank for the first six years of the damages period overlooks several relevant points. AMPs were used to calculate federal rebates, not reimbursement, and states actually were prohibited by CMS from using the AMP figure as a basis for reimbursement. Also, for the first four years of the implementation of OBRA '90, state reimbursement rates were frozen by federal law. We note the coincidence that Sandoz stopped providing that data to the subscription service after States'. abilities to propose changes to their reimbursement formulas unfroze and as the confidentially marketed “spread” began to increase exponentially past anything expected or seen before. 'The early presence of the AMPs in First Data Bank does not defeat the trial court’s ultimate determination of credibility upon weighing all of the evidence. Moreover, the,burden wasmot on the State to ferret out the falseness of Sandoz’s representation. The court found Wetherbee’s testimony credible that:
Well, the barrier was knowledge. I think if “I had had'an awareness of all of the problems associated with AWP that were developing or beginning to develop at that time, then the .AMP would have meant much more to me.... I have since learned that states were prohibited by HCFA from using this AMP figure as a basis for their reimbursement ... [reimbursement] is an accounting function, and the rebates were independent of the reimbursement. This was brand new to all of us'. Rebate was a new game.

. The position of independent, rural pharmacies is born out in the current national conversation on healthcare costs. See How Generic Drugs Can Cost Small Pharmacies Big Bucks, National Public Radio, (Oct. 22, 2015), http: //www.npr.org/sections/health-shots/ 2015/10/22/450600567/how-generic-drugs-can-cost-small-pharmacies-big-bucks (last visited Oct. 28, 2015).

. This Court acknowledged the practice of defining EAC as an increasing discount -of Average Wholesale Price in Jones v. Howell, 827 So.2d 691 (Miss.2002).

. The trial court correctly held that no prejudgment interest was available on the CPA claim because the CPA does not provide for prejudgment interest. ,. .

. We note 'Sandoz’s argument that one of the large punitive damages awards motivating tort reform in 2002 involved a $175 million verdict in favor of the Mississippi Tax Commission. While the statute is unambiguous and is not subject to construction, this argument supports that the’ legislative intent was that the punitive-damages caps apply to the State.

. The statute permits a penalty of up to $10,000 per violation.